The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Matthew Kyle MOUNTS, Defendant–Appellee,

and

Douglas Osborn, Defendant.

No. 89SA49.

Supreme Court of Colorado, En Banc.

Jan. 16, 1990.

Robert R. Gallagher, Jr., Dist. Atty., Brian K. McHugh, Deputy Dist. Atty., Englewood, Paul A. King, Chief Deputy Dist. Atty., Castle Rock, for plaintiff-appellant.

David Lane, Denver, for defendant-appellee.

Justice ERICKSON delivered the Opinion of the Court.

Pursuant to C.A.R. 4.1, the prosecution has taken this interlocutory appeal from an order suppressing statements made by the defendant and other physical and testimonial evidence derived from the defendant's March 18, 1987 statement. We reverse the suppression order and accordingly remand for further proceedings consistent with this opinion.

## I.

Defendant Matthew Mounts is charged with murder in the first degree and conspiracy to commit the murder of Vernon Rouillard. His counsel filed a motion to suppress statements and evidence which was granted. The suppression orders are the basis for this interlocutory appeal.

The defendant, who was twenty-years old when the March 18, 1987 statement was made, was incarcerated in Pueblo for robbery when he was questioned by members of the Douglas County District Attorney's office and by other law enforcement officers. Mounts' lawyers [1] advised investigators that Mounts had information regarding a murder in Douglas County. Prior to the time that Mounts' attorney, Wayne Patton, produced his client for questioning, no concrete evidence existed of the murder of Vernon Rouillard. Mounts had pleaded guilty to a robbery charge in Pueblo and was in custody waiting to be sentenced. His counsel had been retained to represent the defendant in connection with his involvement with the death of Rouillard and "to keep charges from being filed...."

When the district attorney's office concluded its negotiations with defense counsel, a letter dated March 5, 1987 was sent to Mounts' lawyers stating:

Regarding your client and the body buried in Douglas County, I would propose the following agreement:

1. That your client direct us to the body whenever weather conditions permit.

2. That your client takes and passes a polygraph test which determines that he is truthful in that his only involvement in the killing was as an accessory after the fact in the disposal of the body.

3. That your client does everything necessary to recover the murder weapon.

4. That your client testify truthfully at all hearings.

If your client satisfies all of the above conditions, we would not prosecute him as an accessory after the fact for this murder. We would also make all possible efforts to assist him in El Paso County so he would not be incarcerated in the Department of Corrections.

During the suppression hearing, Patton stated that he explained the contract to Mounts and thought that the "agreement" would extricate Mounts from the murder as well as the accessory charge, and "presumed it covered any future charges," but he was unclear as to the explanation he provided to Mounts. The trial court ruled, however, that the attorney-client privilege prevented the prosecution from questioning Patton about the details of what Patton and Mounts discussed.[2] Mounts did not testify at the suppression hearing.

Dale Row, an investigator with the Douglas County Sheriff's Department who conducted the interview with Mounts on March 18, 1987, testified that Mounts "understood" the "agreement" and had no questions. He said that Mounts in "the spirit of the agreement ... [was] to provide information upon request," although that was not in the written proposal. The interview was conducted in a ten feet by ten feet holding cell and Mounts was not in restraints. He was not read a Miranda [3] advisement because the investigator thought he was "a witness at the time." The investigator also stated that Mounts "had come forward with information and wasn't a suspect."

Mounts' attorney Wayne Patton was with him throughout the interview, which lasted just under three hours, and consisted

---

**1.** Joseph Losavio, the former district attorney of Pueblo County, and his associate Wayne Patton, were appointed by the district court of Pueblo County to represent Mounts on the pending robbery charges. While he was awaiting sentencing for the robbery, Mounts' parents retained Losavio and Patton to extricate him from involvement in the murder of Vernon Rouillard. We note that Mounts is represented by other counsel on this appeal.

**2.** The prosecution has not explicitly appealed from this ruling, and thus we express no opinion with respect to its correctness.

**3.** Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

of a narrative by Mounts with questions interposed by Row. The questions related to the facts and circumstances surrounding the death of Vernon Rouillard. No transcript of the interview was prepared, but the report of the interview included Mounts' statement that Douglas Osborn shot Rouillard and that Mounts and Gregory Leber buried Rouillard's body in a shallow grave in a mountainous location in Douglas County. Mounts provided the authorities with a sketch indicating where the body was buried and agreed to show the investigators the burial site.

On March 21, 1987, Mounts went with the officers to the crime scene to search for the body without being advised of his *Miranda* rights. On March 24, 1987, Mounts asked to speak to Row. During the interview no *Miranda* warning was given and a second map was prepared by the defendant. On April 12, 1987, officers met with Mounts to discuss the findings at the crime scene. Again Mounts was not advised of his rights. He again led the investigators to the burial site area, but the body was not located. On April 25, 1987, a National Forest park ranger found the skeletal remains of Rouillard in an area that had been previously searched. The trial court refused to suppress the body, the jacket on the body, or the contents of the jacket, holding that the prosecution had established that the evidence would have been inevitably discovered. *See Nix v. Williams,* 467 U.S. 431, 448–50, 104 S.Ct. 2501, 2511–12, 81 L.Ed.2d 377 (1984).

On May 6, 1987, Mounts took a polygraph examination which was inconclusive. Before he was examined he was advised of his *Miranda* rights, and his attorney was outside the examination room. On May 29, 1987, Officers Row and Adkisson interviewed Mounts after a *Miranda* advisement while he was in custody at the Rocky Mountain Corrections Center. On June 16, 1987, after Mounts once again received a *Miranda* warning, the second polygraph test was taken and the expert concluded that Mounts was deceptive in describing his participation in the crime. Since the agreement called for Mounts to testify truthfully at all hearings, and Mounts failed to pass

the polygraph examination, the district attorney concluded that the immunity agreement was no longer in effect. Mounts was never advised of the district attorney's position or that the agreement was no longer in effect. Mounts then obtained different counsel, and the investigators treated him as a suspect and not a witness.

On February 3, 1988, while Mounts was confined in the Rocky Mountain Correction Center on the Pueblo robbery sentence, he was accused of threatening a confidential informant and was called in for questioning. He voluntarily appeared at the police station and told the police officer that he had not threatened anyone. He volunteered that he was a police informant and then made statements regarding the Rouillard murder which reflected his belief that the immunity agreement was still in effect, and no *Miranda* warning was given. Mounts' March 18, 1987 and subsequent statements were the basis for the murder charges which are now pending against him.

## II.

■ The trial court made findings of fact and conclusions of law and suppressed the March 18, 1987 statement since Mounts was in custody when he was questioned and was not advised of his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The prosecution first justifies the absence of a *Miranda* warning in this case by asserting that Mounts was considered a witness and that he was not in custody for the murder of Rouillard. We have previously rejected this precise argument. *People v. Lee,* 630 P.2d 583, 589 (Colo.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982).

■ The prosecution also contends, however, that *Miranda* does not apply because of the presence of defense counsel. The prosecution's argument is well-taken. In *Miranda,* the Court stated that "[t]he presence of counsel, in all the cases before us today, would be the adequate protective device necessary to make the process of

police interrogation conform to the dictates of the privilege [against self-incrimination]." *Miranda,* 384 U.S. at 466, 86 S.Ct. at 1623. Thus, when the defendant and his chosen defense counsel are given adequate time for consultation prior to any police interrogation, and counsel is actually present at the police interview, the warnings are rendered superfluous. *See United States v. Thevis,* 469 F.Supp. 490, 507–08 (D.Conn.), *aff'd,* 614 F.2d 1293 (2d Cir. 1979), *cert. denied,* 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980); *Collins v. State,* 420 A.2d 170, 176–77 (Del.1980).

■ In this case, Mounts and his attorneys initially approached the district attorney for the purpose of reaching an agreement whereby Mounts would avoid prosecution for the murder of Rouillard. Such an agreement, known as a "cooperation agreement," *see State v. Hanson,* 382 S.E.2d 547, 554–55 (W.Va.1989), was reached by the prosecution and defense counsel. Prior to the police interview on March 18, 1987, Patton explained the provisions of the agreement to Mounts. Although Mounts' assertion of the attorney-client privilege through his counsel prevented the prosecution from establishing the precise understanding of the terms by Mounts, the agreement is straightforward and unambiguous. Row talked to Patton about the agreement before Mounts was brought in, and Patton was present during the interview. Under the circumstances of this case the absence of a *Miranda* warning does not require suppression of Mounts' statement on March 18, 1987.[4]

### III.

The prosecution also challenges the trial court's determination that Mounts' statement was not voluntary due to the existence of the cooperation agreement between Mounts and the district attorney's office, and the ineffectiveness of counsel.

Mounts' statement can only be admitted if it was voluntary. *Jackson v. Denno,* 378 U.S. 368, 376–77, 84 S.Ct. 1774, 1780–81, 12

L.Ed.2d 908 (1964). The prosecution has the burden of establishing the voluntariness of the statement by a preponderance of the evidence. *People v. Fordyce,* 200 Colo. 153, 156, 612 P.2d 1131, 1133 (1980). A statement is voluntary if not "extracted by any sort of threats or violence, *nor obtained by any direct or implied promises, however slight....*" *People v. Pineda,* 182 Colo. 385, 387, 513 P.2d 452, 453 (1973) (quoting *Brady v. United States,* 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970)). It must be the product of an essentially free and unconstrained choice by the maker. *People v. Raffaelli,* 647 P.2d 230, 234 (Colo.1982). Voluntariness of a statement is determined on the basis of the totality of the circumstances under which it is given. *Id.* at 235. Relevant circumstances include events and occurrences surrounding the statement and the mental condition of the maker. *Id.*

The trial court found that the March 5, 1987 cooperation agreement, in conjunction with the advice given by defense counsel, rendered Mounts' statement involuntary. We believe that neither of these factors, however, were sufficient to make the March 18, 1987 statement involuntary.

A promise of immunity or non-prosecution from the district attorney or another in authority will generally constitute a "direct or implied promise[ ]," rendering a subsequent statement from the accused involuntary and inadmissible. *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897). Thus, even when a cooperation agreement such as the one in this case breaks down, and the defendant is prosecuted, courts have suppressed statements that were obtained as the result of the agreement. *See United States v. Weiss,* 599 F.2d 730, 736–37 (5th Cir.1979); *United States v. Kurzer,* 534 F.2d 511, 518 (2d Cir.1976); *Abner v. State,* 479 N.E.2d 1254, 1260 (Ind.1985); *People v. Gallego,* 143 Mich.App. 639, 642–43, 372 N.W.2d 640, 643 (1985), *aff'd,* 430 Mich. 443, 424 N.W.2d 470 (1988); *State v. Han-*

---

**4.** Because we conclude that a *Miranda* warning was not necessary, we do not address the additional contention that there was no custodial police "interrogation" on March 18, 1987. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

*son,* 382 S.E.2d 547, 555 (W.Va.1989) ("Courts have concluded, however, that statements or other inculpatory evidence obtained from the defendant under such cooperation agreements cannot be used against him in the event he does not fulfill the terms of the agreement.").

██ The promise of immunity or non-prosecution must, however, " 'bring about' a confession 'not freely self-determined.' " *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 348, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963) (quoting *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)). Thus, where it is the defendant who initially approaches the prosecutor or police with an offer to make a statement or otherwise cooperate in exchange for immunity or leniency, the resulting statements are not necessarily involuntary. *See People v. Wright,* 127 Ill. App.3d 747, 751–53, 469 N.E.2d 351, 354–55 (1984); *Drew v. State,* 503 N.E.2d 613, 617 (Ind.1987); *State v. Harwick,* 220 Kan. 572, 575, 552 P.2d 987, 990 (1976); *Taylor v. Commonwealth,* 461 S.W.2d 920, 922 (Ky. 1970), *cert. denied,* 404 U.S. 837, 92 S.Ct. 126, 30 L.Ed.2d 70 (1971); *State v. Hutson,* 537 S.W.2d 809, 813–14 (Mo.App.1976); *State v. Starling,* 188 N.J.Super. 127, 132–34, 456 A.2d 125, 129 (Law Div.1983); *State v. Richardson,* 316 N.C. 594, 604–05, 342 S.E.2d 823, 831 (1986). *See also Shotwell Mfg. Co. v. United States,* 371 U.S. at 348–50, 83 S.Ct. at 453–54 (where defendant taxpayers came forward with fraudulent disclosure of unpaid taxes, statements of taxpayers were not rendered involuntary because of Treasury's announced general "voluntary disclosure policy" of non-prosecution).

██ The question is whether Mounts' statement was "freely self-determined." *Rogers v. Richmond,* 365 U.S. at 544, 81 S.Ct. at 741. We believe that it was. Mounts, through his attorneys, initiated negotiations with the district attorney. The authorities did not approach Mounts until after an agreement had been reached, and then only in the presence of defense counsel. By his own statement, Mounts was present when Rouillard was killed and thus would know better than anyone else the extent of his involvement, and whether he could satisfy the terms and conditions of the cooperation agreement. *Cf. People v. Briggs,* 709 P.2d 911, 921 (Colo.1985) (where promise of immunity to witness is made conditional such as upon satisfactory performance on a polygraph, the promisee recognizes possibility that he may not receive immunity; thus, there is not the same degree of compulsion as where there is an unconditional or a formal grant of immunity).

██ Therefore, we do not believe that Mounts' statement was rendered involuntary because of the promises made in the cooperation agreement since those promises were solicited by Mounts himself. Nor did the alleged ineffective assistance of his original counsel make the statement involuntary. The trial court concluded that defense counsel was ineffective in failing to investigate the crime and determining that Mounts may have been lying about his involvement, in allowing Mounts to agree to take a polygraph for the same reason, and in not obtaining an agreement that would cover prosecution for first-degree murder. Whether or not defense counsel should have conducted a more thorough investigation before allowing his client to agree to cooperate is not the key issue because all the relevant facts were known to Mounts. No one compelled Mounts to deceive or lie to his attorneys or anyone else, least of all the prosecutor or police.

██ Finally, the trial judge believed that Mounts' youthfulness prevented him from exercising independent judgment. Mounts was twenty-years old when he gave the March 18, 1987 statement, and is legally considered an adult. If the record demonstrates anything in this regard, it demonstrates Mounts' skill in manipulating the authorities. The fact that Mounts did not give a statement about Rouillard's death until after the agreement was reached is consistent with this attempted manipulation. Therefore, we conclude that the evidence in the record does not support the trial court's finding that Mounts' statement was involuntary.

## IV.

Thus, the trial court erred in suppressing the statement made on March 18, 1987, as well as the fruits of that statement. Because it concluded that all subsequent statements given by the defendant, and evidence obtained therefrom, were inadmissible because they were the product of the prior incriminating response, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the trial court did not consider each statement individually to determine its admissibility. On remand, the trial court should examine the statements made subsequent to March 18, 1987 to determine their independent admissibility. Accordingly, the order of suppression is reversed, and the case is remanded for further proceedings consistent with this opinion.